181 P.3d 819 (2008)
STATE of Washington, Respondent,
v.
Roy Len NEFF, Petitioner.
No. 79121-0.
Supreme Court of Washington, En Banc.
Argued September 27, 2007.
Decided April 24, 2008.
*821 Kathryn A. Russell Selk, Russell Selk Law Office, Seattle, WA, for Petitioner(s).
Kathleen Proctor, Karen Anne Watson, Pierce County Prosecutor's Office, Tacoma, WA, for Respondent.
J.M. JOHNSON, J.
¶ 1 After a stipulated facts trial, a judge found Roy Len Neff guilty of unlawfully manufacturing a controlled substance and added a firearm enhancement. The Court of Appeals affirmed the conviction. State v. Neff, noted at 141 Wash.App. 1001, 2007 WL 2909665 (2007). We granted review of its decision. State v. Neff, 160 Wash.2d 1009, 161 P.3d 1026 (2007). Neff argues that he did not waive his right to appeal, that his firearm enhancement was not supported by sufficient evidence, and that he received ineffective assistance of counsel. He is right on the first argument; he did not knowingly waive his right to appeal.
¶ 2 But he is wrong on the other arguments; sufficient evidence supports the enhancement and he received effective assistance of counsel. Therefore, we affirm.

FACTS AND PROCEDURAL HISTORY
¶ 3 Neff disputes some of the facts found at his trial. Since he was convicted, we construe the facts in the State's favor. State v. Myers, 133 Wash.2d 26, 37, 941 P.2d 1102 (1997).
¶ 4 Pierce County Sheriff Deputy James Jones responded to an unrelated suspicious vehicle call on the afternoon of November 20, 2002. While en route, he smelled a pungent ammonia odor. Aware that ammonia is hazardous, he stopped and investigated. He spoke with Neff's neighbor, who pointed to Neff's house as the probable source of the smell.
¶ 5 Deputy Jones drove through an open gate and up the driveway to Neff's house. As he got out of his car, Neff appeared from behind the house and spoke with Deputy Jones. Neff said he smelled the ammonia too and offered to help find the source. The two began walking around the property.
¶ 6 Walking toward the unattached garage, Deputy Jones noticed a bug sprayer that was missing its pump top. Several signs indicated it had been used to manufacture methamphetamine: there was a mist coming from it and approximately four inches of a yellow-blue liquid was inside over what appeared to be rock salt. A burn pile containing numerous pseudoephedrine pill blister packets lay next to the sprayer. Deputy Jones knew that these pills were a primary ingredient in methamphetamine manufacture.
¶ 7 Neff noticed Deputy Jones observing these items, and he walked the other way. Neff did not get far, as another arriving deputy brought him back to the scene. As the second officer put him in a squad car, Neff tossed a set of keys under Deputy Jones' car. Another deputy retrieved the keys and used the keys to open the garage, thinking the ammonia smell was coming from inside.
¶ 8 In the garage, the officers saw what appeared to be a methamphetamine manufacturing laboratory and a marijuana growing operation. One officer then asked a judge for a search warrant, which he received and the officers executed.[1]
¶ 9 Besides the drug operations, the officers found three handguns in the garage. The first two, a loaded Smith and Wesson .357 and a loaded Colt .45, were found in a locked safe under a desk on the garage's north wall. They found the third, a loaded Davis model P. 380, in a tool belt hanging from the garage rafters. They also found two surveillance cameras covering the yard and serpentine driveway, which an officer *822 testified were for countersurveillance. Inside the garage was a monitor on which the feed from the cameras could be viewed.
¶ 10 Pierce County prosecutors charged Neff with six felony counts and five firearm enhancements. The case proceeded for trial to a jury. After voir dire, Neff and the prosecutor's office reached a deal. The prosecutor agreed to drop all the charges, save for one charge of manufacturing methamphetamine and a firearm enhancement for committing the crime while armed. In return, Neff submitted to a stipulated facts trial, a procedural device where a judge finds facts based on police reports and the other documents.
¶ 11 On November 25, 2003, Neff signed a document titled "Stipulation to Facts Sufficient and Stipulated Bench Trial." The stipulation stated the evidence was sufficient to "support a possible conviction," Clerk's Papers (CP) at 99, and "there is sufficient evidence to support the charged offense and the firearm enhancement." CP at 100. It was stipulated the judge would read the police and forensic reports and the evidence from a previous hearing, and based on only those documents, would decide whether Neff was guilty.
¶ 12 The stipulation contained a section waiving "the following Constitutional rights: the right to a speedy . . . trial . . .; the right to remain silent . . .; the right at trial to hear and question witnesses who testify against me; [and] the right at trial to testify. . . ." CP at 100-01. Two sections later, it waived "the right to challenge the sufficiency of the evidence to support these convictions on appeal,. . . ." CP at 101.
¶ 13 When Neff submitted the stipulation, the trial judge, who also presided over the suppression hearing, asked Neff several questions about it.
¶ 14 "What's your understanding of this document?" the judge asked. 3 Report of Proceedings (RP) (Nov. 25, 2003) at 220. "That I'm making a plea deal with the prosecutor." Id. "Well, that's part of it," the judge responded. Id. Neff's attorney then explained, "[S]ometimes these things can be complicated, so if Mr. Neff is not able to accurately answer your question, I can certainly explain it,. . . ." Id. at 221.
¶ 15 Despite Neff's admitted misunderstanding of the stipulation, the judge accepted the stipulation. Id. at 229.
¶ 16 After the bench trial, the judge found Neff guilty of unlawfully manufacturing methamphetamine. He also found him guilty of being armed while manufacturing, holding that the guns in the garage were readily available to use. He sentenced Neff to 89 months for manufacturing methamphetamine and added 36 months for the firearm enhancement, for a total of 125 months. CP at 120-28.

ISSUES
¶ 17 1. Whether Neff knowingly waived his right to appeal the sufficiency of the evidence supporting his conviction.
¶ 18 2. If the waiver was invalid, whether sufficient evidence supports the firearm enhancement.
¶ 19 3. Whether Neff received effective assistance of counsel.

ANALYSIS
I. Neff Did Not Knowingly Waive His Right to Appeal
¶ 20 Our constitution guarantees criminal defendants "the right to appeal in all cases." WASH. CONST. art. I, § 22. A defendant may waive this right, but only if he does so intelligently and with a full understanding of the consequences. State v. Perkins, 108 Wash.2d 212, 215, 737 P.2d 250 (1987). To show his understanding, the State must prove a defendant understood both his right to appeal and the effect of a waiver. State v. Kells, 134 Wash.2d 309, 314, 949 P.2d 818 (1998). The State goes far in meeting this burden when a defendant signs a waiver statement and admits to understanding it because doing so "creates a strong presumption that the [waiver] is voluntary." State v. Smith, 134 Wash.2d 849, 852, 953 P.2d 810 (1998).
¶ 21 This presumption is not conclusive, though. In Smith, the State charged the defendant with possessing cocaine. Id. at *823 851, 953 P.2d 810. He moved to suppress the cocaine evidence, claiming it was illegally seized. Id. After the trial judge denied the motion, he pleaded guilty, assuming he could appeal the suppression ruling. Id. His counsel stated in court that he was reserving an appeal of the suppression ruling. Id. However, the plea agreement, by its terms, waived the right to all appeals. Id.
¶ 22 We allowed his appeal, despite the written waiver, because Smith did not intelligently waive his right to appeal. Id. at 852, 953 P.2d 810. His counsel's statements conflicted with the plea agreement, but the statements went uncorrected by both the judge and the prosecutor. Id. at 853, 953 P.2d 810. Under the circumstances, we held that the defendant did not knowingly waive his right to appeal. Id.
¶ 23 In the same way here, the State has not shouldered its burden. The stipulation Neff signed is muddled at best and contradictory at worst. It reads, "the judge will decide if I am guilty of the crime," but the next sentence reads, "I stipulate that there is sufficient evidence to support the charged offense and the firearm enhancement." CP at 100. The stipulation waives the right to challenge the sufficiency of "these convictions on appeal," but there were no convictions to appeal at the time because Neff was not pleading guilty by signing. CP at 101.
¶ 24 The colloquy with the judge further clouded the issue. When he asked Neff's understanding of the agreement for a stipulated trial, Neff said he was "making a plea deal with the prosecutor," which he was not. 3 RP (Nov. 25, 2003) at 220. The judge tried to correct this statement and clarify Neff's understanding. Neff's counsel responded, "I read every word on that document. . . . [Neff] appeared to be reading along with me. However, sometimes these things can be so complicated, so if Mr. Neff is not able to accurately answer your question, I can certainly explain it." Id. at 221. These are not facts establishing a knowing waiver of a constitutional right.[2]
¶ 25 The concurrence points out that Neff's counsel understood the agreement. We have no doubt he did. But we are here concerned with Neff's constitutional right to appeal, not his counsel's. Neff incorrectly told the judge he was making a plea deal. When pressed on the issue, Neff's counsel told the judge that the entire thing was complicated and that Neff could not explain it. If it was so complicated that Neff could not explain it, his waiver cannot be held to be knowing.
¶ 26 The State correctly points out our strong preference for "enforcing the terms of plea agreements which are voluntarily and intelligently made." In re Pers. Restraint of Breedlove, 138 Wash.2d 298, 309, 979 P.2d 417 (1999). But we have no preference for enforcing a waiver of a constitutional right if the defendant fails to understand his waiver and its consequences.
¶ 27 Neff's alleged waiver form was confusing and contradictory. His discussion with the trial court judge showed a lack of full understanding. The State argued that he waived his right to appeal the sufficiency of the evidence supporting his conviction before he was even convicted. Under these circumstances, we must hold that Neff did not knowingly waive his right to appeal,[3] and we consider that appeal below.
*824 II. Sufficient Evidence Supports Neff's Firearm Enhancement
¶ 28 Neff claims insufficient evidence supports his firearm enhancement. Since the trial court convicted Neff, we will affirm if sufficient evidence supports the conviction beyond a reasonable doubt, construing the facts in the State's favor. State v. DeVries, 149 Wash.2d 842, 849, 72 P.3d 748 (2003) (deferential standard when reviewing a bench trial). The dissent correctly points out that when the record only contains documents, we review without deference to the trial court. But the record here contains much more than affidavits and documents. The trial court judge also presided over the suppression hearing, where he took testimony. The judge considered testimony when deciding guilt and made an explicit finding that the officer's testimony was credible. Our review is deferential.
¶ 29 A court may add time to a sentence if a defendant was armed with a firearm while committing a crime. RCW 9.94A.533(3). A person is armed while committing a crime if he can easily access and readily use a weapon and if a nexus connects him, the weapon, and the crime. State v. Schelin, 147 Wash.2d 562, 567-68, 55 P.3d 632 (2002); State v. Valdobinos, 122 Wash.2d 270, 282, 858 P.2d 199 (1993).
¶ 30 This nexus requirement is critical because "[t]he right of the individual citizen to bear arms in defense of himself, or the State, shall not be impaired. . . ." Wash. Const. art. I, § 24. The State may not punish a citizen merely for exercising this right. State v. Rupe, 101 Wash.2d 664, 704, 683 P.2d 571 (1984). The State may punish him for using a weapon in a commission of a crime, though, because a weapon can turn a nonviolent crime into a violent one, increasing the likelihood of death or injury. State v. Gurske, 155 Wash.2d 134, 138-39, 118 P.3d 333 (2005).
¶ 31 When a crime is a continuing crime  like a drug manufacturing operation  a nexus obtains if the weapon was "there to be used," which requires more than just the weapon's presence at the crime scene. Gurske, 155 Wash.2d at 138, 118 P.3d 333. This potential use may be offensive or defensive and may be to facilitate the crime's commission, to escape the scene, or to protect contraband. Id. at 139, 118 P.3d 333. In every case, whether a defendant is armed is a fact specific decision. Id.
¶ 32 Since the issue is fact specific, the facts and holdings of our prior cases are helpful. In State v. O'Neal, 159 Wash.2d 500, 503, 150 P.3d 1121 (2007), officers searched the defendants' methamphetamine laboratory. Besides evidence of drug manufacturing, the officers found over 20 guns, body armor, night vision goggles, and a police scanner. Id. A jury found the defendants guilty of manufacturing drugs and added a firearm enhancement. Id.
¶ 33 We affirmed the firearm enhancement. Id. at 502, 150 P.3d 1121. Since the weapons were easily accessible to protect the drugs, and since the defendants kept a police scanner in the laboratory, the jury could find that the defendants used the guns to protect the drugs, and so we upheld their conviction. Id. at 504, 150 P.3d 1121.
¶ 34 In State v. Eckenrode, 159 Wash.2d 488, 491, 150 P.3d 1116 (2007), the defendant called the police, alerting them to an intruder in his house. He told the dispatcher he was armed and ready to shoot the intruder. Id. When the police arrived, he was outside his home, sitting on his porch. Id. Police investigated and found he was growing marijuana and had two firearms in his house. Id. at 491-92, 150 P.3d 1116. A jury convicted him of drug charges and gave a firearm enhancement. Id. at 492, 150 P.3d 1116.
¶ 35 We affirmed his conviction and enhancement. Id. at 491, 150 P.3d 1116. The defendant told the dispatcher he was armed. Id. at 494, 150 P.3d 1116. Police found two weapons, one loaded, and a police scanner in the house. Id. Under those facts, a jury was allowed to infer that the defendant armed himself to protect his criminal enterprise and so was allowed to find him armed while committing the crimes. Id.
¶ 36 In Valdobinos, 122 Wash.2d at 273, 858 P.2d 199, by contrast, police arrested the defendant when he offered to sell cocaine to an undercover officer. They searched his house, finding cocaine and an unloaded rifle under his bed. Id. at 274, 282, 858 P.2d 199. *825 A jury convicted him of drug charges and a firearm enhancement. Id. at 274, 858 P.2d 199.
¶ 37 We reversed the enhancement, holding the jury could not infer from an unloaded rifle near the cocaine that the defendant was armed. Id. at 282, 858 P.2d 199. Notably, however, no evidence indicated the gun was in the house to protect the drugs, as indicated by the presence of loaded weapons and police scanners in O'Neal and Eckenrode. See id.
¶ 38 Here, the trial judge found that "[i]n the defendant's garage the Sheriff's department recovered . . . a loaded Smith and Wesson .357 handgun, a Colt .45, [and] a Davis model P. 380 firearm." CP at 163. He found Neff "was armed because the guns . . . where [sic] readily available for offensive or defensive purposes." CP at 164. On these findings, he held "[t]hat defendant was armed with a firearm while he was manufacturing methamphetamine." CP at 165.
¶ 39 Based on the record, a rational fact finder could agree. When they searched Neff's garage, police found two loaded pistols in a safe, which also contained four bags of marijuana. Neff held the keys to the garage. The police found a third pistol hanging from a tool belt in the garage's rafters. While it is unclear from the record whether Neff could easily reach the gun, we construe the fact in the State's favor. Finally, the officers found two security cameras and a monitor in the garage on which to view live feeds. An officer testified that the monitors were for countersurveillance.
¶ 40 These facts, together with all inferences favoring the State, are enough for a rational person to find beyond a reasonable doubt that Neff was armed. Neff correctly points out "there must be some proof actually linking the gun to the crime of manufacturing, more than just by mere presence and the defendant's constructive possession." Pet'r Suppl. Br. at 11. Additional proof here is provided by the security cameras and video monitor. As in O'Neal, the trial judge was allowed to infer from the additional equipment  the police scanner in O'Neal and the security cameras here  that Neff used the guns to protect his drug operation. 159 Wash.2d at 503, 150 P.3d 1121.
¶ 41 Neff contends there is no evidence or finding that he was in the garage with the guns when Deputy Jones arrived, and so he could not have been armed. But we held in O'Neal, 159 Wash.2d at 504, 150 P.3d 1121, that "[t]he defendant does not have to be armed at the moment of arrest to be armed for purposes of the firearms enhancement." The dissent takes issue with this holding, but O'Neal stated the rule just last year, and we have no reason to overturn it. Neff's drug operation was a continuing crime. Manufacturing is unlike, say, robbery, which happens once. The manufacturing operation is a crime, even if the defendant is elsewhere when the police arrive. Moreover, even the dissent agrees that sufficient evidence supports Neff's manufacturing conviction, even though he was not manufacturing when the police arrived. Sufficient evidence supports the finding that Neff had manufactured methamphetamine in the past and did so with guns at hand and countersurveillance cameras watching for approaching cars.
¶ 42 The dissent asks "what better place [to keep a gun] than locked in a safe or out of reach on a high rafter?" Dissent at 830. There are lawful places to keep guns other than in a methamphetamine lab equipped with countersurveillance cameras watching for police or intruders. It is clear from the record that Neff armed himself and equipped his lab for the purpose of defending his drug operation. Under O'Neal and Eckenrode, this is enough to convict him of being armed while manufacturing drugs.
¶ 43 The State may not punish Neff for owning guns, for keeping them loaded, or for keeping them easily accessible. However, it could enhance his drug manufacturing sentence where it proved beyond a reasonable doubt that Neff used them to defend his drug operation. Given the record, a rational fact finder could have so found, and so we affirm the enhancement.
III. Neff Received Effective Assistance of Counsel
¶ 44 Neff also claims he received ineffective assistance of counsel, both because his *826 counsel failed to argue that Neff was unarmed and for counseling him to accept the stipulated facts trial agreement. We reject his claims.
¶ 45 An ineffective counsel requires reversal if a defendant shows "counsel made errors so serious that counsel was not functioning as the `counsel,'" and "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
¶ 46 Neff cannot show prejudice from his attorney's failure to argue that Neff was unarmed. He bears the burden of proving "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. This he has not done. After reviewing the record, the trial judge's guilty finding was supported by sufficient evidence, and Neff has not proved to us the result would have been different had his counsel argued the issue. See supra section II.
¶ 47 Nor can he show counsel error from the stipulated facts trial agreement. "Judicial scrutiny of counsel's performance must be highly deferential," and "the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
¶ 48 Here, the State originally charged Neff with six felonies and five firearm enhancements. The stipulation reduced the numerous charges to one felony and one firearm enhancement. At oral argument here, Neff's counsel conceded the decision to accept the stipulation was tactical. Neff received effective assistance of counsel.
¶ 49 We therefore affirm the Court of Appeals.
WE CONCUR: GERRY L. ALEXANDER, C.J., CHARLES W. JOHNSON, TOM CHAMBERS, JJ.
BRIDGE, J.[*] (concurring).
¶ 50 I agree with the result of the majority; however, I would resolve this case simply  the State has met its burden of demonstrating that Roy Neff did knowingly, voluntarily, and intelligently waive his right to appeal the sufficiency of the evidence. The agreement Neff signed clearly stated as much, and his attorney confirmed that he reviewed the agreement thoroughly with him. The trial judge engaged in a colloquy in which he gave Neff the opportunity to express any confusion about the agreement, and the judge explained that Neff still had the option to decline to enter into the agreement and have a jury trial instead. Ultimately, Neff expressed neither doubt nor confusion, agreed to the stipulation, and received precisely the sentence he bargained for.[1] I would hold that Neff understood the agreement he was signing and that the waiver of the right to appeal the sufficiency of the evidence was knowing, voluntary, and intelligent.
¶ 51 In November 2002, the State charged Neff with six felony counts: two counts of unlawfully manufacturing a controlled substance, unlawful possession of ammonia with the intent to manufacture methamphetamine, unlawful possession of pseudoephedrine and/or ephedrine with the intent to manufacture methamphetamine, possession of a controlled substance with intent to deliver, and unlawful possession of a firearm in the first degree. The State alleged firearm enhancements on five of the six counts. However, just before beginning a jury trial, the parties reached an agreement. In return for Neff's agreeing to waive certain rights and submit to a stipulated facts trial, the State dropped five of the counts and agreed to charge Neff with only one count of unlawfully manufacturing a controlled substance, plus a firearm enhancement. The agreement provided that *827 Neff would retain his right to appeal the result of a prior suppression hearing but that he was "waiving the right to challenge the sufficiency of the evidence to support [the] convictions on appeal." Clerk's Papers (CP) at 101. The agreement also provided that the State would recommend a sentence of 114 months of confinement. After thoroughly reviewing the stipulation with his attorney, Neff signed it.
¶ 52 The parties then appeared before the trial court. The judge engaged in a colloquy with Neff in which he asked Neff whether he understood the document he had signed. Neff responded that he was "making a plea deal with the prosecutor." Report of Proceedings (RP) (Nov. 25, 2003) at 220. The court then explained each of the rights that Neff was giving up and repeatedly asked whether Neff understood that he was doing so. The trial judge also made it clear that Neff could still decline to enter into the agreement and instead have a jury trial, pointing out that a jury had already been chosen. Neff asserted that he understood the agreement, that no one had forced him to enter into the agreement, and that it was his desire to proceed under the terms of the agreement. Neff's counsel affirmed that he had reviewed the agreement with his client and that he had no doubt that Neff was entering into the agreement knowingly, voluntarily, and intelligently. The judge accepted the stipulation and, after reviewing the record, found Neff guilty of manufacturing a controlled substance as charged and found that there was sufficient evidence to support the firearm enhancement.
¶ 53 Neff now argues that his waiver of the right to appeal the sufficiency of the evidence was not knowing, voluntary, and intelligent. Pet. for Review at 12. The majority accepted this argument. I would not.
¶ 54 Washington State has a strong public policy in favor of accepting and enforcing the terms of voluntary plea agreements where they have been entered into knowingly, voluntarily, and intelligently. E.g., State v. Perkins, 108 Wash.2d 212, 216, 737 P.2d 250 (1987). Yet the majority finds that just as we allowed the defendant in State v. Smith, 134 Wash.2d 849, 953 P.2d 810 (1998), to appeal his conviction in spite of his waiver of that right, we should do so here. Majority at 822-23. Smith is distinguishable. The plea agreement in Smith expressly stated that the defendant would be giving up "`a right to appeal a determination of guilt after a trial.'" 134 Wash.2d at 851, 953 P.2d 810 (quoting Clerk's Papers at 2). However, while discussing the plea agreement in open court with the prosecutor and the trial judge, defense counsel stated that "`[Smith] has reserved the right to appeal the court's ruling on the pretrial motion.'" Id. at 852, 953 P.2d 810 (quoting Report of Proceedings at 61). Defense counsel was mistaken, yet neither the prosecutor nor the judge corrected her. Id. at 853, 953 P.2d 810. The trial judge then discussed the plea agreement with Smith, explaining the rights he was giving up but not mentioning the right to appeal. Id. at 852, 953 P.2d 810. The court found that Smith knowingly, voluntarily, and intelligently waived his rights, and accepted Smith's guilty plea. Id. The Court of Appeals affirmed. Id. We reversed, finding that because defense counsel's statements regarding the reservation of the right to appeal the pretrial ruling went uncorrected, Smith likely believed that he was reserving this right and thus did not knowingly and intelligently waive it. Id. at 853, 953 P.2d 810.
¶ 55 In the instant case, there was no such misunderstanding by defense counsel that could have led to a mistaken belief on the part of Neff. When the parties explained to the judge in open court that in lieu of a jury trial they would be agreeing to a stipulated facts trial, the trial judge asked whether the stipulation would preserve the right to appeal the suppression ruling. RP (Nov. 25, 2003) at 213-24. Both the prosecutor and defense counsel expressed that it would. Id. at 214. The court then reiterated, "And this would self-preserve his right to appeal the suppression motion; is that my understanding?" Id. Defense counsel answered, "Yes. That is a critical part to this negotiated settlement." Id. There was no mention of preserving the right to appeal the sufficiency of the evidence. Later, when the parties were going over the agreement in open court, the trial judge mistakenly asserted that Neff was "reserving" *828 the right to challenge the sufficiency of the evidence. Id. at 224. Defense counsel corrected him and the judge went on to state that Neff was in fact "waiving" this right. Id. Neff's counsel did not misconstrue the agreement as Smith's counsel did, but instead continually asserted that Neff was preserving only the right to appeal the suppression ruling.[2] Neither counsel nor Neff gave any indication that Neff was preserving the right to appeal the sufficiency of the evidence. Smith is inapplicable in these circumstances.
¶ 56 The majority also argues that the agreement was confusing because it referenced "convictions" when in fact Neff intended only to stipulate to facts, not to admit guilt.[3] Majority at 823. Although the wording of the stipulation may have been imprecise, the record demonstrates that Neff clearly understood what he was agreeing to. Prior to entering into the agreement, the trial judge explained:
THE COURT: Mr. Neff understands a stipulated bench trial is a trial, and he could be found guilty? I'm not going to prejudge what's in the State's case, but I know a little bit about it from the suppression hearing, so he has a fairly good chance of being found guilty. Does he understand that?
THE DEFENDANT: Yes, it is my understanding.
RP (Nov. 25, 2003) at 214. Later, Neff's counsel asserted that he explained "every word" of the document and the trial judge went over the agreement in open court. Id. at 221-28. All of this supports a conclusion that Neff understood what he was agreeing to.
¶ 57 The majority contends that Neff's statement that he understood the agreement as "`a plea deal with the prosecutor'" constitutes an "admitted misunderstanding of the stipulation." Majority at 823. The record here belies that characterization. Although Neff did not use the correct legal terminology, the agreement did in fact amount to a "deal with the prosecutor"  the State agreed to drop five felony counts in return for Neff's agreeing to waive certain rights and submit to a stipulated facts trial. Neff's improper use of the word "plea" does not outweigh the evidence demonstrating that he understood de facto what he was agreeing to. Both the trial judge and Neff's counsel explained the ramifications of entering into the agreement, and the trial judge gave him the opportunity to ask questions or decline to enter the agreement at all. RP (Nov. 25, 2003) at 220-28. Neff repeatedly asserted that he understood. Id. In the end, Neff received precisely what he bargained for  five dropped counts, the right to appeal the suppression ruling, and a 125-month sentence. There is no ambiguity. I would therefore find that Neff's waiver of the right to appeal the sufficiency of the evidence in this case was made knowingly, intelligently, and voluntarily and that we should therefore not consider his challenge to the sufficiency of the evidence here.[4]
WE CONCUR: SUSAN OWENS, MARY E. FAIRHURST, BARBARA A. MADSEN, JJ.
SANDERS, J. (concurring in part/dissenting in part).
¶ 58 I agree with the majority that "Neff did not knowingly waive his right to appeal." Majority at 823. However, because the majority *829 fails to properly analyze the substance of his appeal, I must dissent.
¶ 59 Analyzing Neff's firearm enhancement, the majority correctly opines:
The State may not punish [Roy] Neff for owning guns, for keeping them loaded, or for keeping them easily accessible. However, it could enhance his drug manufacturing sentence where it proved beyond a reasonable doubt that Neff used them to defend his drug operation.
Majority at 825. However I disagree "a rational fact finder could have so found" on these facts. Majority at 825.
¶ 60 The majority's conclusion is at odds with the facts stipulated, as well as the legal authorities upon which it relies. The majority begins by claiming, "we will affirm if sufficient evidence supports the conviction beyond a reasonable doubt, construing the facts in the State's favor." Majority at 824 (citing State v. Devries, 149 Wash.2d 842, 849, 72 P.3d 748 (2003)). Myers, however, involved a contested trial, not a trial on stipulated facts. Here we are as able to review these facts as the trial court; in doing so we are not at liberty to vary them but must accept them at face value. See State v. Rowe, 93 Wash.2d 277, 280, 609 P.2d 1348 (1980) (holding facts and conclusions of the trial court based on a written record are reviewed de novo).[1]
The majority claims the operative facts are these:
When they searched Neff's garage, police found two loaded pistols in a safe, which also contained four bags of marijuana. Neff held the keys to the garage. The police found a third pistol hanging from a tool belt in the garage's rafters. While it is unclear from the record whether Neff could easily reach the gun, we construe the fact in the State's favor. Finally, the officers found two security cameras and a monitor in the garage on which to view live feeds.
Majority at 824-25. Elsewhere the majority acknowledges Neff was not in the garage when police arrived. Id. at 821.
¶ 61 There is no basis in this record to support an inference that a pistol hanging from a tool belt in the garage rafters was within "easy reach" of someone in the garage. In fact the police did not even see the pistol during the initial warrantless search of the garage, a fact inconsistent with it being in "easy reach." Clerk's Papers (CP) at 204. Where the State fails to present evidence of a material fact, the court must continue to presume the defendant's innocence regarding that fact. State v. Crediford, 130 Wash.2d 747, 759, 927 P.2d 1129 (1996) ("every person accused of a crime is constitutionally endowed with an overriding presumption of innocence, a presumption that extends to every element of the charged offense"). Since the State bears the burden to prove the guns were within "easy reach," the State's failure to present any evidence to that effect requires us to assume the guns were not within "easy reach" to maintain Neff's presumption of innocence.
¶ 62 Citing State v. Schelin, 147 Wash.2d 562, 567-68, 55 P.3d 632 (2002) and State v. Valdobinos, 122 Wash.2d 270, 282, 858 P.2d 199 (1993), the majority articulates the rule that "[a] person is armed while committing a crime if he can easily access and readily use a weapon and if a nexus connects him, the weapon, and the crime." Majority at 824. The majority goes on to state in a continuing crime, like a drug manufacturing operation, "a nexus obtains if the weapon was `there to be used,' which requires more than just the weapon's presence at the crime scene." Id. at 824 (quoting State v. Gurske, 155 Wash.2d 134, 138, 118 P.3d 333 (2005)). I would add, to prove a firearm was used to commit a crime, the State must prove the individual was armed with a deadly weapon at the time of the commission of the crime, because punishment based solely on the possession of a firearm violates our constitutional right to *830 bear arms. See State v. Eckenrode, 159 Wash.2d 488, 493, 150 P.3d 1116 (2007).
¶ 63 I would apply the aforementioned legal principles as follows. First, there is simply no evidence that Neff could easily access and readily use a weapon for two reasons: (1) he was not in the building where the weapons were located, and (2) even if he had been, the evidence fails to prove they were easily accessible. Two of the guns were locked in the safe, which was in turn locked within the garage, and there is no evidence that Neff even had the keys to the safe. But even if he did, guns stored behind two sets of locks are not "easily accessible and readily usable."[2] As to the pistol hanging from the rafters, there is simply no evidence that it was easily accessible, and the inference is to the contrary. We have no business excusing the State from carrying its burden to prove a critical fact.
¶ 64 The second element to be proved by the State is the nexus connecting the defendant, the weapon, and the crime, which must be proved with more "than just the weapon's presence at the crime scene." Majority at 824. However, for the reasons stated above, that is all we have. A citizen exercising his right to keep and bear arms has to keep the arms someplace  and what better place than locked in a safe or out of reach on a high rafter? Neff had no actual possession of these firearms, he did not actually use the firearms to facilitate the crime in any way, and he simply exercised his constitutional right to keep and bear arms.[3] In the words of the statute he was not "armed." RCW 9.94A.533(3).
¶ 65 Finally, the majority's analysis leads to absurd results. Under its view Neff was "armed" at all times, even while running errands around the city without his weapon at his side. He would be "armed" in the majority's view even if he spent a couple nights in jail for an unrelated misdemeanor. In terms of the rationale behind the firearm enhancement it is hard for me to conceive of how "the risk of serious harm to others is greater,"[4] when an individual does not even have the firearm immediately available for use against another person. But the majority opens the door to this absurd result by holding a person may be "armed" even though he is not near the weapon with which he is supposedly armed and the weapon is in a locked safe or out of reach in a rafter. While the majority gives the constitutional right to bear arms lip service, it seems to do in fact what it eschews in principle: enhance a sentence merely because a gun is present at the scene of the crime.
¶ 66 The majority also goes beyond prior precedents of this court. We have previously opined whether proximity to the weapon is a requirement for a firearm enhancement.
In Valdobinos,[[5]] . . . the defendant was not in close proximity to the weapon when *831 it was discovered, nor was there any evidence that he had been at a time when availability for use for offensive or defensive purposes was important. In Schelin,[[6]] however, the defendant was close to the easily accessible and readily available weapon at the time the police entered the house.
Gurske, 155 Wash.2d at 141, 118 P.3d 333. By ignoring the relative positions of the defendant and the firearms, the court has turned its back on facts it previously found determinative. Simply put, the court allows the State to punish Neff for simply owning firearms, which is his constitutional right.
¶ 67 In addition to relaxing the "easily accessible" requirement, the majority also relaxes the nexus requirement, requiring little more than constructive possession of a weapon. The majority holds the simple presence of a security camera is sufficient to create a nexus between the firearm and the manufacture of methamphetamine. The majority allows the judge to "infer from the [security cameras] that Neff used the guns to protect the drug operation." Majority at 825. However, the facts failed to prove the camera system was functional nor was there evidence demonstrating Neff intended to use, or actually used, the cameras to physically protect his lab.[7] Unlike the police scanners found in State v. O'Neal, 159 Wash.2d 500, 150 P.3d 1121 (2007) and Eckenrode, 159 Wash.2d 488, 150 P.3d 1116, a security camera can be used for purposes other than monitoring the actions of police officers. The evidence presented fails to demonstrate facts sufficient to support an inference Neff used the cameras to protect his operation and certainly fails to demonstrate he planned to use the firearms in concert with the cameras to protect the operation. And, as a matter of stipulated fact, we know he did not.
¶ 68 An individual does not waive his right to bear arms simply because he may commit a criminal act. Rather, the State must prove beyond a reasonable doubt the individual was armed to further the criminal act and not for some other reason. However today's opinion allows judges and juries to infer an individual is armed whenever he stores a firearm, without evidence of accessibility, even where the defendant is not in the same building as the firearms. It further allows the fact-finder to infer the firearms are used to protect a criminal enterprise whenever the defendant owns unrelated equipment which may be used to protect the enterprise. Neff may have manufactured methamphetamine, but it takes the majority to manufacture a firearm enhancement.
¶ 69 Accordingly I concur in part and dissent in part.
NOTES
[1] While Neff unsuccessfully moved to suppress the evidence in the garage at the Court of Appeals, that motion is not before us.
[2] We leave open whether a criminal defendant may ever waive his right to appeal before a guilty plea or a guilty verdict. Normally, a waiver of the right to appeal follows a guilty finding or is coupled with a guilty plea. This makes sense because the right to appeal is different from other constitutional rights. A citizen always has the right to speak on any subject, for example. Wash. Const. art. I, § 5. But no person has a right to a criminal appeal until being found guilty or admitting guilt. Waiving one's right to appeal before a guilty determination is like waiving a right to a jury trial before committing a crime. We need not decide the issue today because even if a citizen can waive his right to appeal before a guilty decision, Neff did not knowingly do so.
[3] The State invites us to strike the whole agreement if we find Neff did not knowingly waive his right to appeal, allowing it to recharge him with the six felonies and five firearm enhancements. We decline to do so. Because the stipulation is contradictory when discussing Neff's right to appeal, it does not clearly waive that right. The State, when drafting, should have been clear or even negotiated a guilty plea.
[*] Justice Bobbe J. Bridge is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] Although the agreement provided that the State would recommend 114 months of confinement, when Neff failed to appear for sentencing the State agreed not to file bail jumping charges in return for increasing the recommendation to 125 months.
[2] Additionally, at Neff's sentencing, trial counsel explained that "the reason that we had proceeded by way of a stipulated bench trial was so that Mr. Neff could preserve a challenge to the search, so I just want to make sure that that is clear. . . ." RP (Oct. 1, 2004) at 6.
[3] In the first paragraph of the stipulation, the parties crossed out "the" conviction and wrote in "a possible" conviction. CP at 99. While they neglected to make such notation on the remaining instances of "the conviction" in the rest of the stipulation, it does appear from this opening paragraph that they were cognizant of the fact that a conviction was not a foregone conclusion.
[4] The majority implies that a defendant may not be able to waive the right to appeal before he or she has been convicted. Majority at 823 n. 2. However, the majority cites absolutely no authority for this proposition. Certainly the parties to an agreement such as the one at issue here recognize that the right to appeal will not materialize if the defendant is not convicted, but I see no reason why this should prohibit a defendant from agreeing to waive the right in advance.
[1] As the majority points out, the stipulated facts relied upon by the trial court judge also included live testimony regarding the initial warrantless search of the garage but not the later execution of the search warrant. Although facts garnered through live testimony are subject to more deferential review, little testimony related to the issue here. See State v. Thomas, 150 Wash.2d 821, 874-75, 83 P.3d 970 (2004).
[2] No Washington court has held a gun in a safe is "easily accessible" to a defendant. In State v. O'Neal, 159 Wash.2d 500, 503, 150 P.3d 1121 (2007), the defendants had more than 20 guns, most of which were located in two safes, only one of which was locked. The court did not consider whether the defendants were armed with these weapons, examining only the accessibility of the two weapons not held in the safe. Id. at 504, 150 P.3d 1121. However, as we have previously held, a gun contained in a backpack behind the driver's seat is not readily accessible. Gurske, 155 Wash.2d at 137, 118 P.3d 333. It is hard to conceive how a weapon in a locked safe and under a desk is more accessible than a gun held in a backpack behind the driver's seat.
[3] The Supreme Court, like this court, has required "more than mere possession" of a firearm to punish a defendant under a similar federal firearms law. Bailey v. United States, 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The Court, appropriately, distinguishes between the active employment of a weapon and the storage of a weapon, which "would . . . embolden or comfort the offender" because of "its availability for intimidation, attack, or defense." Id. at 149, 116 S.Ct. 501. While recognizing the value of storage to a criminal enterprise, the Court held only the active employment of the weapon was "using" the weapon to facilitate a drug operation. Id. at 148-49, 116 S.Ct. 501. Although the federal version of the statute punishes "use" of a gun during a felony, and not the criminal's being "armed" during the felony, the Court's distinction seems to accurately address the danger envisioned by the Washington statute. Namely, the danger an individual would actively brandish a weapon to facilitate a crime, not the inchoate risk of future use stemming from mere possession.
[4] Gurske, 155 Wash.2d at 138, 118 P.3d 333.
[5] Valdobinos, 122 Wash.2d 270, 858 P.2d 199.
[6] Schelin, 147 Wash.2d 562, 55 P.3d 632.
[7] The majority incorrectly indicates the police officer "testified" the cameras and serpentine driveway "were for countersurveillance." Majority at 821-22. The officer indicated in his report, not testimony, the cameras could be used for countersurveillance but provided no evidence Neff used them for this purpose. CP at 216.